UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


NANCY ALLISON and HOLLY BURNEY,
both in their individual capacities and, in
addition, as a collective action on behalf of
others similarly situated,

                      Plaintiffs,

     v.

SCOTT DOLICH and ANNA JOSEPHSON,
individuals, and PARK KITCHEN LLC,
an Oregon limited liability company,

                      Defendants.

_____

Case No.: 3:14-CV-1005-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

      Plaintiffs Nancy Allison ("Allison") and Holly Burney ("Burney") (collectively "Plaintiffs")

brought this collective action against their prior employer seeking damages for violations of the Fair

1

Labor Standards Act (29 U.S.C. §§ 201 - 219) (the "Act"). In an opinion dated September 28, 2016, the court granted Plaintiffs' cross-motion for partial summary judgment on their minimum wage violation claim based on required participation in an invalid tip pool, with regard to liability only.[1] Plaintiffs now move for summary judgment on damages resulting from such claim. Plaintiffs also alleged individual claims for retaliation based on their termination after complaining about the illegality of the tip pool alleged to violate the Act. They move for summary judgment on these claims as well.

The court finds the undisputed evidence, when viewed in a light most favorable to the employer, requires a finding that Burney has established a *prima facie* case of retaliation under the Act and that issues of material fact exist with regard to the causal connection between Allison's complaints and her termination, as well as the damages to which Plaintiffs are entitled on their retaliation claims. Accordingly, Burney is entitled to summary judgment on her retaliation claim for liability only and Allison's retaliation claim and damages related to both Plaintiffs' retaliation claims must be addressed by the ultimate fact finder. With regard to Plaintiffs' motion for summary judgment on the damages resulting from Defendants' minimum-wage violations, the summary of the payroll records provided by Defendants is not admissible and raises genuine issues of material fact, thereby defeating Plaintiffs' summary judgment motion in this regard. Finally, Plaintiffs are entitled to summary judgment only on Defendants' affirmative defenses of failure to state a claim and set-off or prior settlement.

/ / / / /

---

[1] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

*Background*

Plaintiffs, and the individuals who filed consents to join in this action, were employed during the relevant period by defendant Scott Dolich ("Dolich"), the owner of defendant restaurants Park Kitchen LLC ("Park") and the Bent Brick, LLC ("Bent Brick"), in positions customarily entitled to receive tips. Defendant Anna Josephson ("Josephson"), was the general manager of Park and Bent Brick in charge of the "front of the house" during this period. (Allison Decl. dated June 12, 2017, ECF No. 192 ("Allison Decl."), ¶ 6.) Dolich, Josephson, Park, and Bent Brick are collectively referred to as "Defendants."

I.  Defendants' Tip-Pool Policy

Employees at Park and Bent Brick have always worked under a tip-pooling policy, which required employees to contribute all tips received during a shift to a tip pool (the " Pool"), with at least a  portion of the Pool allocated to "back of house staff." (Dolich Decl. dated June 30, 2017, ECF No. 206 ("Dolich Decl."), ¶ 8.) No employee complained about this division of the Pool. (Dolich Decl. ¶ 8.)

In early 2014, Dolich amended the then-existing tip-pool allocations and created the tip- pool policy at issue (the "Policy"). (Allison Decl. ¶ 6.) The Policy continued the previous division of the Pool among the servers, hosts, and kitchen staff working the shift. (Allison Decl. ¶ 6.) Specifically, servers were allotted five points, hosts were allotted two points, and the kitchen staff, as a whole, was allotted two points. (Allison Decl. ¶ 6.) However, Dolich also allotted Josephson one point in the Pool. (Dolich Decl. ¶ 3; Allison Decl. ¶ 6.) Josephson received a share of the Pool for every day Park and Bent Brick were open, even on days she did not work, host, serve, or manage the floor.

(Allison Decl. ¶ 6; Rice[2] Decl. dated June 12, 2017, ECF No. 191 ("Rice Decl."), ¶ 2.)

The parties do not agree on when Dolich presented the Policy to his employees and when he asked them to provide a signed copy of the Policy to him. Dolich represents he explained the Policy to employees at a staff meeting on February 27, 2014, distributing a copy of the Policy to the employees and answering any questions. (Dolich Decl. ¶ 10.) Dolich also contends nearly all Park employees signed the Policy on or around that time. (Dolich Decl. ¶ 22.) Allison agrees Dolich created the Policy sometime around February 2014, but states she did not sign the Policy until a March 20, 2014 staff meeting, and that all other Park employees, with the exception of Burney, signed the Policy at that time. (Allison Decl. ¶¶ 6, 10.) Burney concurs with Allison, asserting Dolich presented the Policy to the employees for signature on March 20, 2014, and she was the only employee who did not sign at that time. (Rice Decl. ¶ 6.) The Policy became effective March 1, 2014. (Dolich Decl. ¶ 9.)

II. Alleged Retaliation

        A. Nancy Allison

Dolich hired Allison as a server at Park in 2009. (Dolich Decl., ECF No. 206, ¶ 4.) Toward the end of her employment, Allison regularly worked Saturday, Sunday, and Monday, serving as manager on duty ("MOD") on her Saturday and Sunday shifts, and was on call on Fridays. (Dolich Decl. ¶ 7.) The MOD is the lead of the front of the house and is expected to identify concerns and issues and share them with Dolich or a manager (Dolich Decl. ¶¶ 7, 12.) Allison was also the wine purchaser for Park and regularly attended Thursday management meetings. (Dolich Decl. ¶ 6.)

---

[2]Burney married and changed her name to Holly Rice after filing this lawsuit. (Rice Decl. ¶ 1.) For consistency, with the exception of citations to her deposition, Rice will be referred to as Burney in this Opinion.

In mid-2013, Allison requested a reduction in her schedule to allow her to devote more time to her personal business, Nan-Made Objects. (Dolich Decl. ¶ 18.) Dolich agreed and hired another server to assume Allison's old shifts. In the summer of 2013, Dolich offered Allison a floor manager position. (Dolich Decl. ¶ 6.) Allison declined the offer, explaining her obligations to Nan-Made prevented her from assuming management responsibilities at Park. (Dolich Decl. ¶ 6.) She did, however, offer to temporarily assist with such duties until a floor manager could be hired. (Dolich Decl. ¶ 6.) Dolich subsequently promoted Nate Smith ("Smith") to the position. (Dolich Decl. ¶ 6.) Dolich noticed Allison and Smith did not have a good relationship and felt is was based, in part, on Allison's resistance to accepting Smith as her supervisor. (Dolich Decl. ¶ 6.)

Starting in late 2013, Allison complained to Dolich, both on her own behalf and on behalf of co-workers, about the payment to managers and the back of the house of nearly half of the twenty-five per cent gratuity added to the bill of private parties. (Allison Decl., ¶¶ 2-3.) About this time, Allison also expressed concern that managers were entitled to share in tips despite not serving tables or hosting during their shifts. (Allison Decl. ¶ 4.) In early 2014, she continued to pass along to Dolich co-workers' concerns with regard to the Policy, Josephson, and Smith, as well as customer dissatisfaction in general. (Dolich Decl. ¶ 11.) Dolich investigated the complaints but was unable to substantiate them and concluded they were false. (Dolich Decl. ¶ 13.)

Once the Policy was implemented in early 2014, Allison objected in a management meeting to Josephson receiving a share of the Pool on days she was not working. (Allison Decl. ¶ 7.) Allison asserts she complained on behalf of herself and others, but Dolich states Allison never expressed personal concerns about the Policy and, in fact, voiced support for the Policy during management meetings in which the Policy was discussed. (Allison Decl. ¶ 7; Dolich Decl. ¶¶ 9, 10; Dolich Dep.

41:13-21.[3]) Allison claims she was barred from attending future management meetings as a result of rasing the objection. (Allison Decl. ¶ 7) Dolich contends Allison continued to attend weekly management meetings through the date of her termination. (Dolich Decl. ¶ 7.)

A few weeks later, Allison learned Smith had been awarded five points in the Pool as a manager/host during a private party. (Allison Decl. ¶ 8.) Allison expressed frustration to Smith, explaining she did not think it fair for a salaried employee to receive any tips and such accommodation was illegal. (Allison Decl. ¶ 8.) That same night she discovered a new employee had been given the Friday night shift she had recently requested from Josephson. (Allison Decl. ¶ 8.) Josephson had denied Allison's request, explaining the Friday night shifts were already full. (Allison Decl. ¶ 8.) Dolich explained the need to hire a new server to cover Allison's shifts made it impossible to comply with Allison's subsequent request to return to a shift when Nan-Made was not as successful as expected. (Dolich Decl. ¶ 18.) Dolich did allow Allison to increase her hours through on-call opportunities, which Allison regularly declined. (Dolich Decl. ¶ 18.)

Dolich reports "Allison's performance on the restaurant floor and her interactions with fellow staff took a negative turn" about this time. (Dolich Decl. ¶ 14.) On March 2, 2014, Allison arrived at least an hour and a half late for her shift, necessitating arrangements for an on-call server to work the shift. (Dolich Decl. ¶ 14.) Allison treated the on-call server poorly, refusing to assist with table numbers or other general information, "cutting" him early, and reporting he was useless. (Dolich Decl. ¶ 14.) Dolich counseled Allison with regard to her behavior, called it "unacceptable." (Dolich Decl. ¶ 14.) A few weeks later, two servers reported Allison exhibited a "negative attitude" while

_____

[3]All of the deposition transcripts were offered as exhibits to the Egan Declaration dated June 12, 2017, ECF No. 189.

working as MOD, and requested they no longer be required to work with her. (Dolich Decl. ¶ 15.) Despite Dolich's request that Allison encourage employees to bring concerns directly to him, Allison continued to take "it upon herself to be the self-appointed liaison for other employees' ostensible (but never confirmed) concerns, and her presence on the floor grew increasingly sour." (Dolich Decl. ¶ 16.)

On March 20, 2014, Allison met privately with Dolich at his request. (Allison Decl. ¶ 9.) Dolich intended to discuss his investigation of her reported concerns and inform her that her attitude and performance while working as MOD were making her co-workers uncomfortable. (Dolich Decl. ¶ 19.) He expressed concern she was not happy at Park and asked if she felt she was able to continue performing her MOD and wine-buying duties. (Dolich Decl. ¶ 19; Allison Decl. ¶ 9.) Allison expressed a desire to relinquish her managerial duties and continue only in the role of a server in her then existing schedule. (Dolich Decl. ¶ 19.)

Allison reports Dolich explained his reasons for the Pool at this meeting and asked Allison to refrain from discussing the legality of the Pool with other employees. (Allison Decl. ¶ 9.) He told Allison "your biggest failing is assuming that any tips belong to you. The tips belong to me, and I can do what I want with them." (Allison Decl. ¶ 9.) Dolich asked Allison if she would still want to work at Park if she was relieved of the wine-buying job, and informed her she would only work Sunday and Monday nights moving forward, as he was making the Friday night shift available to new hires who were more committed to the restaurant. (Allison Decl. ¶ 9.)

Allison felt Dolich was pressuring her to quit so he would not have to fire her, which is why she signed the Policy later that day. (Allison Decl. ¶¶ 9, 10.) Allison met with Burney that night to discuss whether allowing employees who were not traditionally tipped to participate in a tip pool was

legal. (Allison Decl. ¶ 10.)

Dolich terminated Allison the next day. (Allison Decl. ¶ 11.) Allison remembers Dolich stating "[t]he last thing I need is a labor union breathing down my neck." (Allison Decl. ¶ 11.) Dolich denies making this comment. (Dolich Decl. ¶ 24.) Rather, he represents he lost confidence in Allison's ability to properly represent Park while working her shift, and told her she had become toxic and was negatively affecting morale. (Dolich Decl. ¶ 20.) Josephson later confirmed Allison was terminated because of her "toxic attitude." (Allison Decl. ¶ 11.) Moreover, Defendants represent in their interrogatory response that Allison's "poor treatment of fellow employees and morale in front of customers was contrary to Park Kitchen's service methodology, and was the basis for defendants' decision to terminate her employment." (Egan Decl., ECF No. 189 ("Egan Decl."), Ex. 1 at 2.)

After her termination, Allison spent time building Nan-Made and did not seek other employment. (Allison Decl. ¶ 12.) Allison asserts she would have continued working for Defendants while building her business on the side had she not been terminated. (Allison Decl. ¶ 12.) However, Dolich contends Allison informed him she was planning to transition out of Park within a month of her termination. (Dolich Decl. ¶ 20.)

### B. Holly Burney

Burney worked at Park from 2008 until early 2014. (Dolich Decl. ¶ 4.) She regularly worked Friday and Saturday, and was on call on Mondays. (Dolich Decl. ¶ 5.) Burney expressed her concern about the legality of the Policy for the first time when Dolich began presenting it to his employees at staff meetings in early February, 2014. (Rice Decl. ¶ 2.) After discussing the Policy with Allison and other employees, who she stated all shared her concerns, Burney contacted the

Wage and Hour Division and attorney Jon Egan to inquire into the legality of the Policy. (Rice Decl. ¶¶ 2, 3.)

Burney became aware the Policy had been implemented in mid-March when she learned Smith had allocated five points in the Pool to himself as a manager and host. (Rice Decl. ¶4.) She "vigorously objected' to such allocation, but Smith explained Josephson told him "this is the way it has to be and he had no control over it." (Rice Decl. ¶ 4.) Burney met privately with Dolich on March 20, 2014, at Burney's request. (Rice Decl. ¶ 5.) She informed Dolich she had discussed the Policy with the Wage and Hour Division and an attorney, and had been told it was not legal. (Rice Decl. ¶ 5.) Dolich responded he was aware of her concerns about the Policy and Smith's share, he designed and structured the Policy for his restaurants, he thought the Policy was legal and fair, he stood behind it, and it was not going to change. (Rice Decl. ¶ 5; Dolich Decl. ¶ 21; Dolich Dep. 42:25-43:3.) When Burney asked Dolich if he wanted her to leave Park, Dolich responded he could not answer that question but there was a job for her if she wanted to continue to work at Park. (Dolich Decl. ¶ 21.)

Burney was the only employee who refused to sign the Policy. (Rice Decl. ¶ 6.) She objected to signing the Policy as it "states that I am voluntarily giving up my tips, and I don't voluntarily give up my tips," and because she thought the Policy was illegal. (Rice Decl. ¶ 6.) Burney left the meeting with a copy of the Policy, intending to show it to an attorney. (Rice Decl. ¶ 6.)

On April 5, 2014, Smith asked Burney about her signed Policy. (Rice Decl. ¶ 7.) She told Smith she was not going to sign it because she did not agree with it and did not think it was legal. (Rice Decl. ¶ 7.) Smith told Burney that Dolich had an attorney review the Policy and was assured

it was legal.  (Rice Decl. ¶ 7.)  Dolich and Josephson remember Burney explaining she was willing to continue working at Park and accept tips according to the Policy, but she would not sign the Policy.  (Dolich Decl. ¶ 23; Dolich Dep. 99:18-22; Josephson Dep. 60:23-61:4.)

    Shortly thereafter, Smith asked Burney to come to the office, where Josephson waited. (Rice Decl. ¶ 8.)  When Burney again explained her reasons for not signing the Policy, Josephson informed Burney she could either sign the Policy or terminate her employment.  (Rice Decl. ¶ 9.) Josephson stated "legally you can't be employed by Park Kitchen if you don't agree to the tip pool. I really wish it didn't have to be this way.  I don't understand why you won't just sign the damn paper." (Rice Decl. ¶ 9; Dolich Decl. 43:13-24.)  Burney then asked for her final checks, which were in a stack of papers on the desk, along with a "Park Kitchen Notice of Termination" (the "Notice"). (Rice Decl. ¶ 9.)  The Notice read: "Park Kitchen has a tip pool system that has been clearly outlined for each employee in the system.  All employees must sign the agreement in order to be employed at Park Kitchen.  Holly Burney has refused to sign the document that makes it legal for her [to] work under the tip pool system of Park Kitchen."  (Rice Decl. Ex. 1.)  The document provided spaces for Burney to answer two questions: "Do you wish to terminate your own employment at Park Kitchen?" and "Do you wish for Park Kitchen to terminate your employment?"  (Rice Decl. Ex. 1.)  Josephson asked Burney to sign the Notice, identifying it as an agreement to terminate.  (Rice Decl. ¶ 10.) Initially, Burney refused to sign the Notice, but eventually executed it by answering each question with the word "No".  (Rice Decl. ¶¶ 10, 11.)

    Dolich represents "Burney was discharged because she would not sign what we believed to be a lawful, tip pool policy."  (Dolich Dep. 14:3-5.)  Josephson testified Burney was terminated because she would not sign the Policy.  (Josephson Dep. 50:24-51:5.)  Similarly, Defendants

acknowledge in an interrogatory response that Burneys' refusal to comply with Park's tip-pooling policy led to the decision to terminate her employment. (Egan Decl. Ex. 1 at 2.)

III. Prior Court Rulings

In the Second Amended Complaint filed on December 25, 2014 (the "Complaint"), Plaintiffs allege Defendants violated the Act by requiring Plaintiffs, and the collective members, to participate in a mandatory invalid tip pool in violation of 29 U.S.C. § 203(m) and, consequently, violated 29 U.S.C. § 206 by failing to pay them the federal minimum wage when such wage was due. (Second Am. Individual and Collective Allegation Compl., ECF No. 48 ("Second Am. Compl."), ¶¶ 11, 13.) On December 7, 2015, the court granted Defendants' motion for partial summary judgment against Plaintiffs' minimum wage claim, relying on Judge Mosman's analysis in *Rocksmore v. Hanson*, No. 3:14-cv-01114-MO, 2015 WL 852938 (D. Or. Feb. 14, 2015), and *Oregon Rest. & Lodging v. Solis*, 948 F. Supp. 2d 1217 (D. Or. 2013). *Allison v. Dolich*, 148 F. Supp. 3d 1142, 1154-55 (D. Or. 2015)("*Allison I*"). Judge Mosman rejected the formal rule promulgated by the Department of Labor ("Department")[4] in 2011 (the "2011 Rule") extending the tip credit and related restrictions found in 29 U.S.C. § 203(m) to all employers, not just those taking the tip credit, as contrary to clear congressional intent. In so ruling, Judge Mosman followed the Ninth Circuit's ruling in *Cumbie v. Woody Woo, Inc.*, 596 F.3d 577, 583 (9th Cir. 2010), that employers who pay employees the federal minimum wage are not subject to, and therefore not in violation of, 29 U.S.C. § 203(m). *Solis*, 948 F. Supp. 2d at 1224-27. Adopting Judge Mosman's reasoning, this court specifically found Defendants paid Plaintiffs a wage in excess of the federal minimum wage and did not take a trip

---

[4]Congress authorized the Department to promulgate necessary rules, regulations, or orders with regard to the Act.

credit under 29 U.S.C. § 203(m). *Allison I*, 148 F. Supp. 3d at 1154. Therefore, Defendants were

not subject to the tip-pool restriction found in that statute. *Id*.

On February 23, 2016, the Ninth Circuit reversed *Solis*, finding the 2011 Rule was closely

aligned with congressional intent, reasonable, and enforceable. *Oregon Rest. & Lodging v. Perez*,

816 F.3d 1080, 1090 (9th Cir. 2016). On March 4, 2016, this court granted Plaintiffs' oral motion

to reinstate the tip pool claims and vacate the December 2015 opinion "to the extent inconsistent

with the Ninth Circuit's recent decision in [*Solis*]." (Supp. Order dated March 4, 2016, ECF No. 91.)

On September 28, 2015, the court granted Plaintiffs' cross-motion for partial summary judgment on

their minimum wage claim with regard to liability only. *Allison v. Dolich*, 3:14-CV-1005-AC, 2016

WL 5539587 (D. Or. Sept. 28, 2016)(*Allison II*.) The court determined the practical outcome of the

invalid tip pool effectively required Plaintiffs to pay Defendants for the right to work. *Id*. at *6. It

then acknowledged undisputed evidence "that, in at least one payroll period, Defendants' tip-pool

requirement decreased a plaintiff's effective hourly rate below the federal minimum wage based on

a calculation involving the total tips accumulated during the payroll period, the amount paid to

employees not customarily tipped, and the share of tips to which Plaintiffs were entitled based on

hours worked" which it deemed "sufficient to find Defendants violated the minimum wage provision

of the Act by requiring Plaintiffs to participate in an invalid tip pool, resulting in an effective hourly

wage rate below the federal minimum in at least one instance." *Id*. at *9. The court expressly noted

it did not find that Plaintiffs " method of calculation correctly establishes the proper apportionment

of damages between Plaintiffs." *Id*.

### Legal Standard

Summary judgment is appropriate where the "movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2017). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2017). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I.  Retaliation Claims

*A.  Prima Facie Case*

Plaintiffs allege Defendants terminated them in retaliation for "complaining about, opposing and refusing to 'voluntarily' agree in writing to the [Policy]" in violation of the Act.  (Second Am. Compl. ¶ 16.)  The Act prohibits an employer from discriminating, or retaliating, against an employee for complaining about violations of the Act.  29 U.S.C. § 215(a)(3) (2017).  The *prima facie* elements for a retaliation claim under the Act are:  (1) the plaintiff was engaged in a protected activity; (2) the plaintiff was thereafter subjected by his employer to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Rocksmore*, 2015 WL 852938, at *8 (citing *Singh v. Jutla & C.D. & R's Oil, Inc.*, 214 F. Supp. 2d 1056, 1059 (N.D. Cal. 2002)).  Although the elements for a retaliation claim are different from a gender discrimination claim, the *McDonnell Douglas* framework has been adapted to both claims and the burden-shifting scheme is the same.  *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).  Thus, if the employee establishes a *prima facie* case of retaliation, the employer may rebut it by producing "evidence sufficient to dispel the inference of retaliation raised by the plaintiff."  *Cohen v. Fred Meyer, Inc.*, 686 F.3d 793, 796 (9th Cir. 1982).  The burden then shifts to the employee to produce evidence that the employer's proffered reasons are pretextual.  *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. at 248, 255-56 (1981).

14

The Supreme Court has recognized the Act as a remedial statute, requiring that it "not [be] interpreted or applied in a narrow or grudging manner," but rather construed broadly to effectuate its underlying purposes. *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944). Moreover, the Court acknowledges Section 215(a) expresses the intent of Congress "to provide an incentive for employees to report wage and hour violations by their employers." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292-93 (1960). *See also Arias v. Raimondo*, 860 F.3d 1185, 1191-92 (9th Cir. 2017)(extending the Act's retaliation provision to non-employers because "Congress clearly means to extend section 215(a)(3)'s reach beyond actual employers" to help ensure the Act's primary objective.)

Defendants apparently concede Plaintiffs were subjected to an adverse employment action. However, Defendants assert Plaintiffs' complaints do not constitute protected activity and that they have failed to establish a causal connection between the protected activity and the adverse employment action.

1. Protected Activity

An employee need not file a formal or detailed complaint to enjoy the protection of Section 215(a). *Lambert v. Ackerley*, 180 F.3d 997, 1007-08 (9th Cir. 1999). Rather, "[to] fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). The threshold issue, which must be determined on a case- by-case basis, is whether the described activity placed the employer on "fair notice that an employee is making a complaint that could subject the employer to a later claim of retaliation." *Rosenfield v.*

*GlobalTranz Enterprises, Inc.*, 811 F.3d 282, 286 (9th Cir. 2015). "[I]t is clear that so long as an employee communicates the *substance* of his allegations to the employer (e.g., that the employer has failed to pay adequate overtime, or has failed to pay the minimum wage), he is protected by § 215(a)(3)." *Lambert*, 180 F.3d at 1008 (emphasis in original).

Allison complained the Policy was unfair because managers were entitled to share in the Pool on days they did not work the floor, or work at all for that matter. Defendants contend these complaints are merely "an expression of discontent related to wages" and do not qualify as protected activity. (Defs.' Resp. to Pls.' Mot for Summ. J., ECF No. 205 ("Defs.' Resp."), at 10.) While these comments on the "fairness" of the Policy may not be protected activity, Plaintiffs also complained, on at least one occasion each, that the Policy was illegal. A complaint that an employer's conduct is illegal adequately communicates the substance of the employee's complaint and is sufficient under Section 215(a)(3). *Rocksmore*, 2015 WL 852938, at *9 (oral opposition to "illegal tip pool" during staff meeting sufficient to put reasonable employer on notice employee was seeking protection of the law.) Plaintiffs clearly asserted rights protected by the Act and sought to enforce the terms of the Act when they complained the Policy was illegal.

Defendants contend that even assuming Plaintiffs' complaints sufficiently advised Defendants of their assertion of rights under the Act, such complaints were not objectively reasonable or made in good faith and, therefore, were not protected activity. Defendants claim that in light of *Cumbie,* the legal landscape at the time of Plaintiffs' complaints could lead a jury to find such complaints were not objectively reasonable or made in good faith.

As recognized by Judge Mosman in *Rocksmore*, complaints about illegal activity must be "objectively reasonable" or "in good faith" to justify protection from retaliation under the Act.

*Rocksmore*, 2015 WL 852938, at *9. Judge Mosman relied on *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001), which held an employee must reasonably believe the conduct about which they complain could be unlawful. *Rocksmore*, 2015 WL 852938, at *9. The Eleventh Circuit measures the objective reasonableness of an employees' belief against existing substantive law. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). However, the Seventh and Tenth Circuits employ a less restrictive test, finding Section 213(a)(3) protects complaints asserted with the belief the conduct is unlawful, even if the relevant law is not violated or such violation is unproven. *Sapperstein v. Hager*, 188 F.3d 852, 856-57 (7th Cir. 1999)("Section 213(a)(3) does not require that a plaintiff be discriminated against because he reported conduct constituting an action violation, but only because he 'filed any complaint or instituted . . . *any* proceeding *under or related to* this chapter.'"); *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984)("The section protects conduct based on good faith, although unproven, belief that the employer's conduct is illegal.")

Even assuming the more restrictive view of the Eleventh Circuit controls, the court finds as a matter of law that Plaintiffs' complaints about the legality of the Policy were objectively reasonable and in good faith. First, the 2011 Rule relevant to the issue before the court did not exist at the time *Cumbie* was issued, distinguishing *Cumbie* from the case at hand.

Second, Judge Mosman relied on *Cumbie* in *Rocksmore* and *Solis* to support his finding the 2011 Rule was contrary to legislative intent and invalid, removing employers who paid the federal minimum wage from the tip-pool requirements found in 29 U.S.C. § 203(m). The defendants in *Solis*, the Department, and the Secretary and Deputy Administrator of the Department, appealed Judge Mosman's ruling on August 21, 2013, arguably placing not only *Rocksmore* and *Solis*, but also

17

*Cumbie*, in dispute during the relevant period.

Finally, the record establishes Burney discussed the Policy with both the Wage and Hour Division and an attorney, and was advised the Policy was illegal. An employee who complains about the legality of an employer's conduct after obtaining assurance from a knowledgeable third party that the employer's conduct is illegal has undeniably acted in good faith and in an objectively reasonable manner. Even more damaging to Defendants is the undisputed evidence establishing Burney informed Dolich she discussed the Policy with the Wage and Hour Division and an attorney, and was told the Policy was not legal. This information would place any employer on "fair notice that an employee is making a complaint that could subject the employer to a later claim of retaliation." See *Rosenfield*, 811 F.3d at 286.

### 2. Causal Connection

Defendants also argue issues of fact exist with regard to the causal relationship between Plaintiffs' complaints and their termination. To establish the requisite causal link between protected activity and an adverse employment action, an employee must show "by a preponderance of the evidence that engaging in the protected activity was one of the reasons for the [adverse employment action] and that but for such activity the [employee] would not have been fired." *Ruggles v. Cal. Polytechnic St. Univ.*, 797 F.2d 782, 785 (9th Cir. 1986)(quoting *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 345 (9th Cir. 1982); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002). A causal connection may be inferred from "the employer's knowledge that the [employee] engaged in protected activity and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

In their reply brief, Plaintiffs concede a genuine issue of material fact exists with regard to a causal connection between Allison's allegedly protected activity and her termination. Accordingly, Plaintiffs' motion for summary judgment on Allison's retaliation claim fails. On the other hand, the court finds Burney's termination was directly related to her concerns regarding the legality of the Policy and summary judgment is appropriate on her retaliation claim.

Defendants assert "a reasonable juror could conclude that Ms. Burney was terminated because she refused to sign receipt of a lawful (see *Cumbie* and this Court's December 7, 2015 summary judgment order) employment policy, irrespective of what the policy contained or whether doing so constituted protected activity." (Resp. at 18.) This argument somewhat mirrors Defendants' assertion Plaintiffs' complaints were not actionable because the Policy could be viewed as lawful at the time of the complaints. However, "[i]f the employee's refusal to accede to an employer's policy is based on a *reasonable* belief that the policy is unlawful, the employee's conduct is a protected manner of opposition." *Equal Emp't Opportunity Comm'n v. Luce, Forward, Hamilton & Scripps*, 303 F.3d 994, 1005 (9th Cir. 2002), *overruled on other grounds in reh'g en banc*, 345 F.3d 742 (9th Cir. 2003)(emphasis in original). The court has already found Burney's complaint was reasonable. That she refused to sign what might have been a legal tip-pooling policy does not raise a genuine issue of fact with regard to causation.

Defendants acknowledge, on numerous occasions, that Burney was terminated because she would not sign the Policy. There could be no more convincing evidence of causal connection than this acknowledgment. Defendants' knowledge of Burney's complaint and the proximity between such complaint and her termination further supports this conclusion.

Viewing the evidence in the light most favorable to Defendants, the court finds Plaintiffs'

complaints about the legality of the Policy were protected activity. Defendants concede both Plaintiffs were subjected to an adverse employment action. Burney has established the requiste causal connection between her complaint and her termination and is entitled to summary judgment on her retaliation claim with regard to liability. As Allison effectively withdrew her summary judgment motion with regard to causal relationship, her motion for summary judgment on her retaliation claim is denied.

   B. *Damages*

   In the final paragraph of each Plaintiffs' retaliation argument, Plaintiffs identify the damages they are seeking. Specifically, Plaintiffs acknowledge the amount each received as back wages in the settlement of their claim before the National Labor Relation Board. In this action, they additionally seek liquidated damages under 29 U.S.C. § 216(b), as well as non-economic damages, in amounts equal to their back wages, and punitive damages equal to four times the combined economic and non-economic damages, or eight times their back wages. Defendants contend questions of fact exist with regard to Plaintiffs' damage claims. Defendants assert liquidated damages under 29 U.S.C. § 216(b) are discretionary, factors relating to the effect the termination had on the Plaintiffs must be considered when determining if non-economic damages are warranted and the amount of such damages, the Ninth Circuit has not determined if punitive damages are available for a retaliation claim under the Act, and evidence that Defendants acted maliciously, oppressively, or with reckless disregard is relevant to the appropriate amount of punitive damages.

   It is unclear from Plaintiffs' summary judgment briefing whether Plaintiffs are seeking summary judgment on the amount of damages to which they are entitled. Plaintiffs appear to merely describe the damages they are claiming and do not reference any authority on which they are relying,

other than 29 U.S.C. § 216(b), in support of such damages in their initial briefing. Moreover, Plaintiffs do not respond in any way to Defendants' arguments in their reply briefing, apparently conceding consideration and an award of damages is premature. An award of damages is clearly premature on Allison's retaliation claim, as she concedes she has failed to establish the requisite causal connection. The court also finds consideration of damages on Burney's claim should be reserved for trial to allow the relevant fact finder to consider the propriety of liquidated damages, the effect of the termination on the Plaintiffs, and Defendants' intent. To the extent Defendants have raised legal issues, such as the propriety of punitive damages in a retaliation claim under the Act, such issue may be addressed through a motion in *limine*, which will afford Plaintiffs an opportunity to respond to Defendants' arguments.

## II. Minimum Wage Claim

Having obtained summary judgment on their minimum wage claim with regard to liability, Plaintiffs now move for summary judgment on the damages to which they are entitled under such claim. In support of their motion, Plaintiffs offer a spreadsheet[5] consolidating the time and pay records received from Defendants (the "Spreadsheet"). Defendants object to the admissibility of the Spreadsheet, claiming it is not a summary of underlying records admissible under Federal Rules of Evidence 1006 ("Rule 1006"), and contend the Spreadsheet leaves several material questions of fact unanswered. Additionally, Defendants assert summary judgment is inappropriate for employees who

---

[5]Plaintiffs originally offered a spreadsheet as Exhibit 1 to the Lauzier Declaration dated June 12, 2017, in conjunction with the filing of their motion for summary judgment. Defendants objected to the spreadsheet, arguing it contained some duplications. Plaintiffs then offered a revised spreadsheet allegedly eliminating the duplicate information. This second version of the spreadsheet, filed as Exhibit 1A to the Lauzier Supplemental Declaration dated July 17, 2017, is the Spreadsheet referenced herein.

failed to consent to join this action and for employees who filed their consent after the relevant limitations period expired.

*A. The Spreadsheet*

1. Admissibility

The Spreadsheet was compiled by Plaintiffs' counsel and contains the following information for each pay period: 1) identification of the source of the data; 2) restaurant at issue; 3) employee's name; 4) whether employee is tip-eligible for the time period; 5) pay date; 6) employee's hours; 7) employee's pay; 8) tips paid to employee; 9) minimum wage due employee; 10) *Trejo* buffer; 11) tips paid to non-tip-eligible employees ("Bad-Tips"); 12) total hours worked by all tip-eligible employees; 13) employee's percentage share of total hours worked; 14) employee's share of tips paid to non-tip-eligible employees; and 15) federal minimum wage violation. Defendants assert not all of the information contained in the Spreadsheet is taken from Defendants' payroll records. For example, Defendants argue the minimum wage due the employee, the *Trejo* buffer, the share of tips to which an employee is entitled, and the resultant federal minimum wage violation are all calculations made by Plaintiffs based on their theory of damages.

The evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(c) (2017). The court must determine what evidence is admissible, relevant, and substantive. FED. R. EVID. 104 (2017). A party filing a motion for summary judgment will generally support that motion with affidavits or declarations. Rule 56 requires that the affidavits or declarations "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the

matters stated." FED. R. CIV. P. 56(c)(4). In ruling on a motion for summary judgment, the court will consider the admissibility of the proffered evidence's contents, not its form. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its content."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

Rule 1006 allows a proponent to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." FED. R. EVID. 1006 (2017). The rationale behind the rule is to offer "the only practicable means of making their contents available to judge and jury." FED. R. EVID. 1006 advisory committee's note to 1972 proposed rules. "The proponent of a summary must establish a foundation that (1) the underlying materials upon which the summary is based are admissible in evidence; and (2) the underlying documents were made available to the opposing party for inspection." *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984); citing *United States v. Johnson,* 594 F.2d 1253, 1254–57 (9th Cir.), *cert. denied,* 444 U.S. 964, 100 S. Ct. 451, 62 L. Ed. 2d 376 (1979).

Here, Plaintiffs offer a summary, or chart, of documents produced by Defendants in discovery, eliminating the need for Plaintiffs to make the records available to Defendants. Furthermore, the underlying materials, Defendants' payroll records, are admissible as a business record under FED. R. EVID. 803(6). However, Rule 1006 is limited to summaries which prove the content of the underlying documents. Summaries which contain information not provided by the underlying documents, including interpretations of the information, are not admissible. *S.E.C. v. Amazon Nat. Treasures, Inc.*, 132 F. App'x 701, 703 (9th Cir. 2005)(summary which organized and

presented voluminous financial records, and did not apply interpretive expertise to the records, found admissible); *Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 222–23 (9th Cir. 1957)("While the [summaries] in question undoubtedly contain information drawn from Moore's ledger, they also contain computations which are not reflections of ledger entries. . . . [They] should not have been received in evidence.")

The identification of employees, hours worked, pay dates, and wages and tips paid in the Spreadsheet undoubtedly derive from Defendants' payroll records. On the other hand, the computation of what Plaintiffs believe they should have been paid includes information from outside sources, such as statutory wage rates, and are based on Plaintiffs' preferred calculation method clearly, information clearly not found in Defendants' payroll records.

Moreover, Plaintiffs' assertion that particular employees are entitled to receive tips during a workweek is not a fact inherently clear from Defendants' payroll records. Plaintiffs represent they have identified servers and bartenders as tip-eligible employees. Based on the payroll records provided by Plaintiffs in support of the Spreadsheet, an employee's status as a server or bartender is not listed on Defendants' payroll records. Accordingly, the Spreadsheet depicts Plaintiffs' characterization of a tip-eligible employee, information not contained in Defendants' records.

Additionally, to be admissible under Rule 1006, a summary chart must contain relevant information. FED. R. EVID. 402 (2017). Relevant evidence includes "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401 (2017). The Spreadsheet contains data and calculations for employees who are not members of the class and, therefore, are irrelevant to this action. For example, included in the Spreadsheet is information from

Bent Brick for pay dates from October 5, 2011, to February 5, 2013, which identify Sarah P. Hammond, Adam Robinson, Danielle M. Strom, David Segal, and Caleb Smith as the only tip-eligible employees. None of these tip-eligible employees are members of the class, making this nearly four-page portion of the Spreadsheet irrelevant to the issues at hand. Not only is this information irrelevant, it could be viewed as prejudicial to Defendants with regard to the willfulness of Defendants' actions and the amount of damages recoverable by the members of the class.

2. Issues of Fact

Defendants assert that even if the Spreadsheet is admissible, it leaves several material questions of fact unanswered. Defendants observe that the Act requires minimum wage violations be calculated for a workweek and complain the Spreadsheet calculates such violations for pay periods. Additionally, Defendants question Plaintiffs' method of calculating proper tip distribution, noting errors in the Spreadsheet, and object to unexplained changes in the characterization of tip-eligible employees.

a. Pay Period v. Workweek

Defendants contend the Spreadsheet improperly relies on calculations based on a pay period rather than a workweek, as required by the Act. The relevant provision of the Act, 29 U.S.C. §206(a)(1)(C), states that "every employer shall pay to each of his employees who in any workweek[6] is engaged in commerce . . . not less than . . . $7.25 an hour."

The Ninth Circuit recently considered the proper unit of measure to apply when gauging compliance with the minimum-wage provision of the Act. *Douglas v. Xerox Business Servs., LLC,*

[6]The relevant regulations define an employee's workweek as "a fixed and regularly recurring period of 168 hours – seven consecutive 24-hour periods." 29 C.F.R. §778.105 (2017).

875 F.3d 884 (9th Cir. 2017). After considering the statutory text, the purpose of the Act, agency interpretation, other court decisions, Congress's failure to act in light of such interpretation and decisions, and the need for uniformity among the circuits, the Ninth Circuit adopted the "per-workweek measure as a feasible and permissible interpretation" of the Act. *Id*. at 886-890. It characterized its ruling as consistent with dicta found in *Adair v. City of Kirkland*, 185 F.3d 1055, 1062 n.6 (9th Cir. 1999), that "employees are still being paid a minimum wage when their salaries are averaged across their actual time worked." *Douglas*, 875 F.3d at 890. The language of *Douglas* implies "workweek" is one possible interpretation of the Act's requirement, but not necessarily the only proper interpretation. Furthermore, *Douglas* and the cases it relied on[7] considered whether minimum wage compliance should be calculated by the hour or less than weekly intervals, or by the workweek. They did not consider the issue before the court, whether such compliance may be calculated by an interval longer than a workweek, such as a pay period, as well as by the workweek.

The Ninth Circuit's reference to, and arguable reliance on, statements made by the Department specifically identifying the workweek as the proper period to measure minimum-wage compliance provides additional guidance. For example, shortly after the minimum wage statute was passed in 1938, the Department issued a statement providing that "[f]or enforcement purposes, the Wage and Hour Division is at present adopting the workweek as the standard period of time over which wages may be averaged to determine whether the employer has paid the equivalent of [the minimum wage]." *Id*. at 887 (quoting Wage & Hour Release No. R-609 (Feb. 5, 1940), *reprinted in* 1942 Wage Hour Manual (BNA) 185.) Similarly, as of September 6, 2017, "the Department of

---

[7]*Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353 (8th Cir. 1986); *Dove v. Coupe*, 759 F.2d 167 (D.C. Cir. 1985); *Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193 (4th Cir. 1969); *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487 (2d Cir. 1960).

Labor's website states in no uncertain terms that 'the workweek is the basis on which determinations of . . . compliance with the wage payment requirements of the [Act] are made." *Douglas*, 875 F.3d at 888 (quoting eLaws – FLSA Overtime Calculator Advisor, U.S. Dep't of Labor, http://webapps.dol.gov/elaws/flsa/otcalc/glossary.asp?p=workweek).

Based on case law and agency interpretation, it is clear the preferred method for determining minimum-wage compliance is based on the workweek, and in no event is calculated using a period shorter than a workweek. Plaintiffs have based their minimum-wage violations on a pay period, not a workweek. However, based on the sample payroll records offered by Plaintiffs,[8] Defendants' records are based on pay periods and do not identify hours worked, wages earned, or tips paid for a workweek, making it impossible for Plaintiffs to analyze minimum-wage violations based on a workweek. Plaintiffs should not be penalized because Defendants failed to keep, or provide, accurate or proper time records.

The Act requires employers to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time . . . as necessary or appropriate for the enforcement of the provisions of this Act or the regulations or orders hereunder." 19 U.S.C. § 211(c) (2017). The regulations specify such records shall include the "time of day and day of week on which the employee's workweek begins," "hours worked each workday and total hours worked each workweek," and "total daily or weekly straight-time earnings or wages due for hours worked during the workday or workweek." 29 C.F.R. § 516.2(a) (2017).

In light of this statutory requirement, the United States Supreme Court shifted the burden of

---

[8]Lauzier Decl. Ex. 2.

proof on the amount of damages from the employee to the employer where the lack of the proper records prevents the employee from establishing a violation of the Act. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-688 (1946). In *Anderson*, the Court acknowledged an employee seeking unpaid minimum wages "has the burden of proving that he performed work for which he was not properly compensated" and the duty of the employer, who is "in a position to know and produce the most probative facts concerning the nature and amount of work performed" to keep "proper records of wages, hours and other conditions and practices of employment." *Id*. at 686-87. "When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing production of those records." *Id*. at 687. On the other hand, where the employer fails to keep proper and accurate records, the employee generally suffers from an inability to adequately prove his damages. The Court reasoned the "remedial nature of [the Act] and the great public policy which it embodies" militate against enforcing a "impossible hurdle for the employee." *Id*. It then found that

> [i]n such a situation . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even if the result be only approximate.

*Id*. at 687-88. The Court recently reaffirmed this holding in *Tyson Foods, Inc. v. Bouaphakeo*, ___ U.S. ___, 136 S. Ct. 1036, 1048 (2016).

Plaintiffs have proved they performed work for which they were not compensated, as established by the court's granting Plaintiffs' summary judgment motion on the issue of liability.

While the Spreadsheet is inadmissible at this stage (but raises genuine issues of material fact as detailed below), the calculation of unpaid wages based on pay periods rather than workweeks is not fatal. The Spreadsheet constitutes sufficient evidence to show the amount of damages as a matter of just and reasonable inference, thereby satisfying Plaintiffs' burden. Defendants may rebut this inference by offering records containing hours, wages, and tips paid to each employee during their established workweek and calculating minimum-wage violations based on this per-workweek data. At this stage, Defendants have failed to offer any scenario in which calculating the minimum-wage violations alleged by Plaintiffs on a workweek basis would result in any different result than calculations on a pay-period basis. However, Defendants may present such evidence at trial.

b. Calculation of Proper Tip Distribution

In their opening brief, Plaintiffs assert that in the absence of information on the amount each tip-eligible employee received from customers, allocation of Bad-Tips, or "tips received by non-tip-eligible employees for that pay period," should be based on the percentage of hours worked by each tip-eligible employee when compared to the total hours works by all tip-eligible employees.[9] In the example provided by Plaintiffs for the pay period from January 16 through 21, 2014, Plaintiffs determined the percentage for each tip-eligible employee and then applied the percentage to the Bad-Tips. However, the tips paid to the tip-eligible employees ("Good-Tips") during this same period do not correlate to the percentages applied to Bad-Tips. For example, Plaintiffs determined Brandon Page was entitled to thirty-three percent of the Bad-Tips during the relevant period yet he received

_____

[9]While Plaintiffs relied on this allocation method in support of their motion for partial summary judgment for liability on their minimum wage claim, the court granted the partial summary judgment "without finding this method of calculation correctly establishes the proper apportionment of damages between Plaintiffs." *Allison II*, 2016 WL 5539587 at *9.

thirty-eight percent of the Good-Tips for the same period.   A comparison of the percentages paid to Allison during the period presents a more dramatic discrepancy.  Plaintiffs assert Allison is entitled to twenty-nine percent of the Bad-Tips when she received only sixteen percent of the Good-Tips.

The percentage of Bad-Tips allocable to tip-eligible employees could be based either on the Good-Tips paid during the relevant period or on the number of hours worked by the tip-eligible employees during that period.  Plaintiffs provide no justification for treating Good-Tips and Bad-Tips differently.  An equally, if not more, reasonable approach would allocate Good-Tips and Bad-Tips under the same percentage.  Plaintiffs have not established, as a matter of law, that their method of allocation is the only, or even best, method for determining minimum-wage violations.  In the absence of a determination on the proper calculation to be applied to the data found in Defendants' payroll records, the Spreadsheet merely supports Plaintiffs' position and raises a question of fact with regard to the proper allocation  method.

### c.  Errors

In support of their argument the Spreadsheet contains errors, Defendants note Plaintiffs included duplicate entries for Andrea Bais-Escobedo.  Plaintiffs acknowledge such errors in their reply and offer the corrected version of the Spreadsheet currently before the court, noting this was the only duplicate entry.

While Plaintiffs may have corrected the single mistake identified by Defendants, the court discovered another error when comparing the Spreadsheet to Plaintiffs' sample calculation of the proper allocation of Bad-Tips.  In the sample calculation provided in their motion for summary judgment, Plaintiffs note Allison received a bonus of $527.34 during the pay period ending January

31, 2014, which should be added to her wages for the purpose of calculating minimum wage violations. (Pls.' Mot. for Summ. J., ECF No. 188 ("Pls.' Mot.") at 23.) Consequently, the sample indicates Allison received $1,135.64 in wages, resulting in a *Trejo* buffer of $694.62 and damages of $228.56. (Pls.' Mot. at 23, 25.) However, in the Spreadsheet the bonus is not included in Allison's wages for the same pay period. Rather, the Spreadsheet states Allison received $608.30 in wages, resulting in a *Trejo* buffer of $167.28 and damages of $755.90. (Lauzier Decl. Ex. 1A at 46.) Consequently, the Spreadsheet is in error in at least one particular and creates a genuine issue of material fact on the amount of damages due the class members.

### d. Characterization of Tip-Eligible Employees

Finally, Defendants argue Plaintiffs' characterization of an employee as tip eligible is inconsistent and not supported by evidence. Defendants assert four named employees are designated both tip-eligible and non-tip-eligible employees without an explanation or supporting evidence but do not identify the specific pages on which these inconsistencies occur. The court is not obligated to locate these inconsistencies in the sixty-five page exhibit and declines to do so. *See Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010)(courts have "no independent duty to scour the record" in search of genuine issues of fact); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.") Nevertheless, the court became aware of another apparent discrepancy while reviewing the Spreadsheet.

Specifically, the Spreadsheet identifies Sarah P. Hammond ("Hammond") as the only tip-eligible employee working at Bent Brick during several pay periods while up to three tip-eligible

employees worked at Bent Brick in virtually all other pay periods.[10]  For example, during the first reported pay period ending on October 5, 2011, Hammond, Adam Robinson ("Robinson"), and Danielle M. Strom, were all designated as tip-eligible employees working at Bent Brick. (Lauzier Decl. Ex. 1A at 1.)  The three employees worked a total of 170 hours and were allegedly entitled to share in $1,230.20 of Bad-Tips.  (Lauzier Decl. Ex. 1A at 1.) Similarly, for the pay period ending May 4, 2012, Hammond and Robinson were characterized as tip eligible, worked a total of 91 hours, and were entitled to share in $2,460.86 of Bad-Tips.  (Lauzier Decl. Ex. 1A at 2.)  However, Hammond was the only employee identified as tip-eligible for the pay period ending June 20, 2012.  (Lauzier Decl. Ex. 1A at 3.)  Hammond worked a total of 26 hours that pay period and is listed as the sole beneficiary of $3,301.85 in Bad-Tips.  (Lauzier Decl. Ex. 1A at 3.)  For the pay period ending September 20, 2012, Hammond was again designated as the only tip-eligible employee.  (Lauzier Decl. Ex. 1A at 3.)  The Spreadsheet reveals she worked 18 hours during the pay period and should have received Bad-Tips in the amount of $2,563.39.  (Lauzier Decl. Ex. 1A at 3.)[11]

While an explanation may exist for why the number of  tip-eligible employees working at Bent Brick range from three employees working 170 hours to one working 18 hours during a pay period, it seems inconceivable that Hammond would be the sole tip-eligible employee working at Bent Brick during a pay period in which more than $2,500 in Bad-Tips were generated.  These inconsistencies create a genuine issue of material fact with regard to the proper identification of tip-

[10]Camille Titus was the only other tip-eligible employee working solo at Bent Brick, which occurred once during the pay period ending on January 17, 2014.  (Lauzier Decl. Ex. 1A at 11.)

[11]Hammond also worked as the only tip-eligible employee for 51 hours during the pay period ending August 20, 2012, and was deprived of $2,326.04 in Bad-Tips, and for 40 hours during the pay period ending September 5, 2012, and was deprived of $2,017.55 in Bad-Tips.  (Lauzier Decl. Ex. 1A at 3.)

eligible employees in the Spreadsheet.[12]   Furthermore, it is generally unclear how Plaintiffs

determined who was tip eligible, and the Spreadsheet reveals issues and concerns with regard to such

characterizations.

The court finds the Spreadsheet is not admissible as a summary or chart under Rule 1006 and

reveals several issues of material fact.  Consequently, Plaintiffs' motion for summary judgment on

the issue of damages related to Defendants' violation of the minimum wage provision of the Act is

denied.

*B.  Failure to Opt-In*

Defendants assert Plaintiffs' motion for summary judgment should be denied for any

employee who has failed to file a consent to join this action.  Specifically, Defendants argue Allison

and Burney never filed a consent to join.  Plaintiffs contend the original complaint, filed on June 20,

2014, and electronically signed by both Allison and Burney, constitutes a consent to join.

Alternatively, Plaintiffs argue declarations electronically signed and filed by Allison and Burney on

October 20, 2014, in which each identify themselves as a "named plaintiff in this lawsuit," similarly

satisfy the consent to join requirement.

The Act provides that no employee will be considered a party plaintiff to a minimum wage

action "unless he gives consent in writing to become such a party and such consent is filed with the

court in which the action is brought."  29 U.S.C. § 216(b) (2017).  Many courts have held, and

Plaintiffs do not dispute, that a named plaintiff in a collective action under the Act must file a written

consent to be recognized as a party in that action.  *Frye v. Baptist Mem'l Hosp., Inc.*, 495 Fed. Appx.

---

[12]The court finds the absence of any tip-eligible employees identified as working at the Bent
Brick during the first half of 2016,during which time tips ranging between $3,193.20 and $7,137.26
were generated, to be equally problematic and unexplained even if irrelevant to the matters at hand.

669, 675 (6th Cir. 2012)(the Act "require[s] a named plaintiff in a collective action to file a written consent to join the collective action."); *Harkins v. Riverboat Servs., Inc.*, 385 F.3d 1099, 1101 (7th Cir. 2004)("The statute is unambiguous: if you haven't given your written consent to join the suit, or if you have but it hasn't been filed with the court, you're not a party. It makes no difference that you are named in the complaint, for you might have been named without your consent."); *Cancilla v. Ecolab, Inc.*, No. C 12-03001 CRB, 2013 WL 1365939, at *2 (N.D. Cal. April 3, 2013)("[C]ourts have consistently held that even named plaintiffs in collective actions must filed consents."); *Ketchum v. City of Vallejo*, 523 F. Supp. 2d 1150, 1155 (E.D. Cal. 2007)("When a 'collective action' is filed under § 216(b) all plaintiffs, including named plaintiffs are required to file a consent form with the court in which the actions is brought.") However, the Act does not provide a description of the form of such consent or require specific material be contained in such consent.

Plaintiffs here argue such requirement is met when a named plaintiff also signs the filed complaint. While courts consistently require a named plaintiff in a collective action to consent to the suit, the appropriate manner of doing so is not as straightforward. District courts in the Ninth Circuit have held "[a] named plaintiff may provide the required written consent either by personally signing the complaint, or by signing and filing a separate document that provides his or her written consent." *Thomas v. Talyst, Inc.*, No. C07-202JLR, 2008 WL 570806, at *2 (W.D. Wash. Feb. 28, 2008)(citing *Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1139 (D. Nev. 1999)). On the other hand, district courts in other Circuits conclude "some document in addition to the complaint must be filed." *Callari v. Blackman Plumbing Supply, Inc.*, 988 F. Supp. 2d 261, 281 (E.D.N.Y. 2013)(quoting *D'Antuono v. C & G of Groton, Inc.*, No. 3:11cv33 (MRK), 2012 WL 1188197, at *2 (D. Conn. April 19, 2012)). These courts agree that a declaration identifying the declarant as a

named plaintiff in the collective action and manifesting a clear intent to be a party plaintiff satisfies the Act's consent requirement. *Callari*, 988 F. Supp. 2d at 282; *D'Antuono*, 2012 WL 1188197, at *2; *Mendez v. The Radec Corp.*, 260 F.R.D. 38, 54 (W.D.N.Y. 2009).

The court agrees with other district courts in this circuit that Allison and Burney provided adequate consent when they signed the original complaint. Moreover, on October 10, 2014, Allison and Burney filed declarations in support of a motion for preliminary collective certification in which they identify themselves as "a named plaintiff in this lawsuit," and describe facts supporting their claims. (Allison Decl. dated Sept. 24, 2014, ECF No. 32, ¶ 1; Burney Decl. dated Sept. 25, 2014, ECF No. 33, ¶ 1.) These declarations substantially meet the requirements of the other courts as well. Accordingly, the court finds Allison and Burney have filed the requisite consents to join in this action.

## C. Statute of Limitations

The parties offer different opinions on the effect of the tolling of the statute of limitations by the court in a minute order dated September 26, 2014 (the "Tolling Order"). (Order dated Sept. 26, 2014, ECF No. 21 ("Order").) Plaintiffs argue the Tolling Order remains in effect while Defendants' contend the tolling ceased in December 2014, when the court denied Plaintiffs' formal motion for tolling.

On September 26, 2014, the court held a discovery conference to address Defendants' complaint with regard to subpoenas issued by Plaintiffs to companies providing payroll services to Park and Bent Brick. Park was the only restaurant named in the original complaint and Defendants argued payroll records for Bent Brick were irrelevant and undiscoverable. Defendants conceded the propriety of the subpoenas if Bent Brick was added as a defendant. The court quashed the subpoenas

and ordered the parties to brief a motion to add Bent Brick as a defendant and issues related to the subpoena should Bent Brick not be added as a defendant.

In light of the statute of limitations running before a prospective member could filed a consent to join a collective action under the Act, Plaintiffs expressed concern a delay in obtaining payroll records could result in absent collective members losing the right to recover damages for numerous pay periods. In response, the court tolled the statute of limitations pending resolution of the motion to amend. Specifically, the court ordered "the FLSA statute of limitations applicable to all employees and putative employees of Park Kitchen and The Bent Brick is ORDERED tolled pending further order." (Order.)

At the conference, Plaintiffs mentioned the possibility of seeking to toll the statute of limitations from an even earlier date. Consequently, the court directed Plaintiffs to include any arguments for formal tolling in the previously ordered briefing.

Plaintiffs filed a motion to amend, for tolling and corrective notice, and arguments supporting the subpoenas, on October 10, 2014 (the "Motion"). In the Motion, Plaintiffs sought "to extend the Court's tolling of the absent collective members' FLSA statutes of limitation back to June 26, 2014," based on allegations of misconduct by Defendants. (Pls.' Tripartite Mot. as Ordered by the Court in Dkt. 21, ECF No. 27 ("Pls.' Tripartite Mot.") at 5.) Plaintiffs relied on evidence of Defendants having provided putative class members misleading information about the lawsuit in staff meetings and correspondence. (Pls.' Tripartite Mot. at 5-12.) As additional support, Plaintiffs noted Defendants refused to supply contact information for potential class member in response to a request for such information in a May 5, 2014 demand letter. (Pls.' Tripartite Mot. at 12-13.)

In an opinion and order dated December 16, 2014, the court denied Plaintiffs' motion for

tolling and corrective notice. (Op. and Order dated December 16, 2014, ECF No. 47 (the "Tolling Op.") at 2.) The court found equitable tolling of the Act's statute of limitations based on refusal to provide contact information prior to conditional certification was not justified and the communications between Defendants' and putative class members were not out of the ordinary. (Tolling Op. at 15.)

Plaintiffs did not request, and the court did not expressly order, the continued tolling of the statute of limitation beyond the period stated in the Tolling Order. The original tolling was intended to protect prospective class members from losing damages during the court's deferral of its ruling on the discovery of payroll records while the parties briefed the addition of Bent Brick as a defendant. The Tolling Order was entered in response to Plaintiffs' concerns related to the court's decision to handle the discovery issue in this manner. Plaintiffs offered no other reason for seeking the Tolling Order and the Tolling Order was temporary pending resolution of the issues raised in the Motion. The denial of Plaintiffs' motion for tolling and corrective notice effectively ended the tolling period created in the Tolling Order. Consequently, the Tolling Order effectively tolled the statute of limitations for a period of eighty-three days from September 26, 2014, to December 16, 2014.

This conclusion is supported by Plaintiffs' request for an order "tolling the statue of limitations for putative collective members" in their motion for conditional collective certification filed March 31, 2016 (the "Certification Motion"). (Pls.' Mot. for Conditional FLSA Collective Certification, ECF No. 92 ("Pls.' Cert. Mot."), at 2.) If the Tolling Order was not temporary, but continuous, then Plaintiffs's request for tolling in the Certification Motion would have been duplicative and unnecessary. The court granted the Certification Motion in an opinion and order

dated September 28, 2016. (Op. and Order dated September 28, 2016, ECF No. 129.) Accordingly, the statute of limitations was again tolled from either March 31, 2016, the date the Certification Motion was filed, or September 28, 2016, the date the court granted the Certification Motion, in addition to the eighty-three day period in 2014, if relevant.

The Spreadsheet appears to calculate minimum-wage damages based on an assumption the statute of limitations was tolled continuously from September 26, 2014. Because it as not, the Spreadsheet does not offer a proper calculation of damages and defeats Plaintiffs' motion for partial summary judgment on the issue of minimum-wage damages.[13]

## III. Affirmative Defenses

Plaintiffs move for summary judgment on all affirmative defenses asserted by Defendants in their Answer. Defendants do not specifically object to this motion but do offer arguments based on asserted affirmative defenses in response to Plaintiffs' motion for summary judgment on their claims.

The court denied Defendants' motion to dismiss Plaintiffs' claims, thereby defeating Defendants' first affirmative defense of failure to state a claim. Plaintiffs are not seeking recovery of back wages already paid to them in the underlying settlement, but only statutory damages derived therefrom. Consequently, Defendants' sixth affirmative defense of set-off or prior settlement is moot. Plaintiffs' motion for summary judgment on Defendants' first and sixth affirmative defenses

---

[13] Also relevant to a damage determination is the statute of limitations applicable to Plaintiffs' minimum-wage violations. The Act provides an action for unpaid minimum wages "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. §255(b)(2017). As the court has not found Defendants acted willfully and genuine issues of material fact exist, the issue must be considered and resolved by the ultimate factfinder prior to the determination of damages.

is granted.

Defendants presented evidence of a legitimate business purpose to create a genuine issue of material fact with regard to the causal connection between Allison's complaints and her termination, as well as with regard to recoverable damages. Defendants' second affirmative defense of good faith, legitimate business purpose is proper. Similarly, evidence that Defendants sought and obtained legal advice with regard to the legality of the Pool was presented to the court. This advice, along with the inconsistent rulings on the applicability of the tip-pool restrictions to employers not taking the tip credit, and the validity of regulations with regard to such issue, adequately supports Defendants' assertion its actions with regard to the Pool were not willful. Consequently, Defendants' fifth affirmative defense of non-willfulness remains viable.

Defendants' third affirmative defense of statute of limitations is at issue with regard to minimum-wage violations as discussed above.

In their fourth affirmative defense, Defendants contend Plaintiffs did not mitigate damages. Defendants offered evidence that Allison did not seek other employment after her termination, providing support for the failure to mitigate defense. To the extent such mitigation relates solely to Plaintiffs' back wages, which were mutually agreed upon in the settlement of the underlying action before the National Labor Relations Board, the affirmative defense is without merit. However, such evidence would also be relevant to the effect of the termination on Allison and, therefore, to discretionary damages under the Act.

Accordingly, Plaintiffs' motion for summary judgment on Defendants' second, third, fourth, and fifth affirmative defenses is denied.

/ / / / /

*Conclusion*

Plaintiffs' motion (ECF No. 188) for summary judgment is GRANTED with regard to Burney's retaliation claim on liability only and Defendants' first and sixth affirmative defenses, and is DENIED in all other respects.

DATED this 12th day of February, 2016.


_____
/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge